**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 27, 2010**

_____
**JOHN C. AKARD**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-12049 |
| | § | |
| TERRY WAYNE HAMANN, | § | CHAPTER 7 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| NEO VENTURES, LLC, | § | |
| SWARTZ & BROUGH, INC., | § | |
| and MARK BROUGH, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | ADV. NO. 09-01164-CAG |
| v. | § | |
| | § | |
| TERRY WAYNE HAMANN, | § | |
| Defendant. | § | |

### MEMORANDUM OPINION ON
### OBJECTION TO THE DISCHARGABILITY OF DEBTS

Neo Ventures, LLC ("Neo"), Swartz & Brough, Inc. ("SBI"), and Mark Brough (collectively with Neo and SBI, the "Plaintiffs") seek a judgment against Terry Wayne Hamann (the Debtor in the captioned Bankruptcy case and the Defendant in this Adversary Proceeding) and a determination that the Defendant's debts to the Plaintiffs are excepted from discharge in

the Debtor's Bankruptcy case.[1]   The Plaintiffs rely on § 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.[2]   The court determines that the Defendant's debts are excepted from discharge.

**FACTS**

The events at issue took place between May and July 2007.  The parties are associated with one another as follows:  Mark Brough, a plaintiff in this case, lived in Midland, Texas and worked with Adam Wagner at the business Wagner & Brown in the 1980s and early 1990s.  Adam Wagner eventually formed the business Neo, also a plaintiff in this case.  Brough knew Andrew Swartz in Midland, and the two formed SBI in 1996.  SBI is a plaintiff in this case as well.

Mr. Brough moved to Austin, Texas.  His future in-laws introduced him to the Defendant, from whom he purchased a house in 2005.

The Defendant is a CPA and former partner with Ernst & Young.  At the time the events at issue took place, he was Chairman and CEO of three entities.  The first was PGI Holdings, LLC ("PGI"), which was the parent company of the second: Access 2 Real Estate Investments, LLC ("A2REI"), which was the parent company of the third: Sunninghorse Acquisitions, LLC ("Sunninghorse").  He was the majority owner of PGI.

The Defendant and Nancy J. Williamson (the Chief Financial Officer of PGI) were the principal authors of a thirty-eight page Private Placement Memorandum ("PPM") for Sunninghorse dated May 1, 2007.  The first page of the PPM states that:

> SUNNINGHORSE Acquisitions, LLC (the "Company") is hereby offering for sale 100 investment units (the "Investment Units").  Each Investment Unit consists of a $50,000 promissory note obligation bearing interest at 12% per annum, payable quarterly, a profits participation right in the project and a conversion right to invest in the parent company as described more fully within this private placement memorandum.

Following some language pointing out that this is a speculative investment involving a high degree of risk, the first page contains the statement: "All Proceeds Go To The Company."  The quoted statement appears again on page 10 of the PPM.

Page 4 of the PPM included an executive summary and stated the following about Sunninghorse:

---

[1] This court has jurisdiction in this matter under 28 U.S.C. § 1334 (a) and (b), 28 U.S.C. § 157(a) and (b), and the Order of Reference of Bankruptcy Cases and Proceedings by the United States District Court for the Western District of Texas, August 13, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(I).  This court may enter a final judgment and a monetary judgment in this matter if appropriate.  *Morrison v. Western Builders of Amarillo* (*In re Morrison*), 555 F.3d 473, 479–80 (5th Cir. 2009).

[2] The Bankruptcy Code is 11 U.S.C. § 101 *et. seq.*  References to section numbers are references to the Bankruptcy Code.

> Sunninghorse Acquisitions, LLC ("the Company") is a limited liability company owned by Access 2 Real Estate Investments, LLC. The Company is <u>a single purpose entity</u> engaged in acquiring Sunninghorse, LLC, which owns 61 rental town homes ("Property") which will be renovated, improved and sold to the general public during a 2 year period. The property is ideally situated in prosperous Montgomery County, just minutes outside of the District of Columbia on Connecticut Avenue. [Emphasis added].

Page 5 of the PPM answered "frequently asked questions." One concerned a limited guarantee by Sunninghorse's parent company:

> **<u>What is the limited guarantee from Access 2 Real Estate Investments, LLC?</u>** The Operating Member [Access 2 Real Estate Investments, LLC] provides a limited guarantee of the principal of the notes. The Operating Member is a newly formed company which is intended to acquire and hold an increasing number of real estate investments. In addition, there is a backup line of credit of $1M to Access 2 Real Estate Investments, LLC by its parent company (PGI Holdings, LLC).

Another question posed on page 5 is:

> **<u>What is an Accredited Investor?</u>**
> An accredited investor is a person who is sophisticated with investments and:
> - Has an annual income of $200,000 for current and each of the past 2 years.
> - Has a net worth in excess of $1 million.

Page 7 of the PPM elaborated on the structure and business of the Sunninghorse:

> Sunninghorse Acquisitions, LLC, a Texas limited liability company (the **"Company"**), was formed by Access 2 Real Estate Investments, LLC, a Texas limited liability company (the **"Parent"**), <u>for the sole business purpose</u> of purchasing 100% of the member interests of Sunninghorse, LLC, a Maryland limited liability company (the **"Owner"**), in order to purchase, own and control the 61 town homes that are owned by Sunninghorse, LLC. The town homes are currently rented to individual tenants but which will be converted into single family residences and sold to the tenants and the public over a 24 month period. [Bold as in the original; underlining added for emphasis]

Pages 18–22 of the PPM addresses risk factors in the investment. The following statement appears at the top of page 19:

**Lack of Prior Operating Experience and History**
The Company has conducted no business operations and it has no current material liabilities.  <u>As its sole material assets, [sic] the Company owns the agreement to acquire 100% of the outstanding member interest of Sunninghorse, LLC,</u> which owns 61 town homes in Kensington, Maryland.  Accordingly, the Company's future success is dependent upon its ability to acquire Sunninghorse, LLC and renovate, market and sell the 61 town homes.  Accordingly, the Company has no history on which to base an evaluation of its business prospects.  The Company's prospects must be considered in light of the risks, expenses, and difficulties frequently encountered by companies in their early stages of development and those risks, expenses and difficulties encountered by companies entering the real estate industry.  [Emphasis added]

The PPM required that each investor submit proof that the investor qualified as an "Accredited Investor," and that each investor sign a subscription agreement which is page 26 of the PPM.  That agreement stated:

THIS SUBSCRIPTION AGREEMENT IS FINAL, BINDING, AND IRREVOCABLE.  <u>If the Company is unable to complete the proposed acquisition of Sunninghorse, LLC, which owns the 61 town homes in Kensington, MD, the Company will promptly return all subscription proceeds to me, without any interest earned.</u>  [Emphasis added].

The Defendant began disseminating the PPM to raise money for Sunninghorse.  He contacted Mr. Brough who, after reviewing the PPM, visiting with the Defendant, and corresponding with the Defendant by e-mail, invested $25,000 on May 18, 2007.  He signed a subscription agreement and furnished the other information required by the PPM.

Mr. Andrew Swartz testified on behalf of SBI.  He met the Defendant through Mr. Borough and had one meeting with the two of them.  At that meeting the Defendant represented that "a substantial portion" of the $5 Million had been committed.  Mr. Swartz received a copy of the PPM in early May 2007 and read it thoroughly.  He testified that he relied on the representations and that SBI invested $100,000 on May 23 2007.  He signed a subscription agreement and furnished the other information required by the PPM.

Mr. Swartz also testified that he was relying on the guarantee of Sunninghorse's obligations by its parent, A2REI and the fact that A2REI had a line of credit from its parent PGI.  However, he was very distressed when he learned, after the deal fell through, that the line of credit was not supported by cash, but was rather a necked promise.  He felt he had every right to believe that the line of credit was supported by cash.

Mr. Adam C. Wagner testified on behalf of Neo, of which he is the sole member.  He was introduced to the Defendant by Mr. Brough.  Mr. Wagner met with the Defendant three times before he invested.  The Defendant told him that the funding was going well and that the offer

would close by June 15, 2007.  The Defendant encouraged Mr. Wagner to invest before it was too late.

On June 10, 2007, the Defendant sent to Mr. Wagner an e-mail (Plaintiffs' exhibit 55) in which the Defendant stated:

> I just returned from meetings in Washington, DC about the project and our PPM, which went very well.  We are very pleased with the project and are on track to hit the projected results over the next 2 years.  Based on capital invested and what is in process we are not likely to extend the offering deadline beyond June 15.  We will close on all investment commitments in process as of June 15 as soon as possible through the end of the month in order to accommodate travel plans and schedules.

Mr. Wagner testified that he relied on these representations and the PPM when he had Neo invest $50,000 on June 14, 2007.  He signed a subscription agreement and furnished the other information required by the PPM.

The Defendant testified that each investor submitted the requested information, signed a subscription agreement and was issued a promissory note.  He also testified that the offering did not go as well as hoped, and that it was closed with only $500,000 raised, rather than the hoped for $5 million.  The Defendant believed he could find other sources of funds to complete the project.

The evidence, based on the bank records of the Defendant's various entities, revealed that funds received for Sunninghorse were, within a week of receipt, used for other of the Defendant's other projects and for expenses.

The Defendant acknowledged that Sunninghorse never had an agreement to acquire 100% of the interest in Sunninghorse, LLC.  He also stated that he expected the Plaintiffs to rely on his statements and the PPM.

A Memorandum of Understanding dated Saturday June 30, 2007 [Plaintiffs' Exhibit 14] reads as follows:

> In January of 2007, we, Terry Hamann, Mike Curtis and John Chapman began to work together to form a business that was to locate and acquire properties in the Washington D.C. metropolitan area.  The entity was to have been PGI Holdings, LLC which had already been formed in Texas by Terry Hamann.  The property located at 14000 Connecticut Ave and owned by Sunninghorse, LLC is one property the three had identified.  Work had begun on the project and had reached a point were a contract had been prepared although a final agreement has not been reached.  Due to certain circumstances it is now advantageous to all three that Mike and John continue working on the project.  Therefore, the three agree to release each other from any obligations and hold each other harmless.

> And it is further agreed that Terry Hamann releases Pat McKeever and Miller, and Miller and Canby Law firm and will sign the release prepared by Miller, Miller and Canby. Mike Curtis and John Chapman will hold Terry harmless and will share any obligation for the services of Pat McKeever.

The memorandum is signed by J. Michael Curtis, John S.H. Chapman, Jr., Terry W. Hamann and by Terry W. Hamann for PGI Holdings, LLC.

On July 25, 2007, the Defendant sent a letter on A2REI letterhead to each of the Plaintiffs telling them he had "some very distressful news" regarding the status of the real estate project in Maryland (Plaintiffs' exhibit 41). He stated:

> We were off to a good start in June and believed that we were in pretty good shape to close on the properties, after addressing and overcoming a couple of start-up and financing issues. This month, however, has turned into somewhat of a nightmare for us here in Austin.

> We have undertaken an investigation to determine all of the facts and circumstances around the apparent loss of the Sunninghorse and Weldon Court town home projects. . . .

> I am sorry to have to bring this unwelcome news to your attention; however, we do want to reassure you of our intent to return your investment to you as soon as possible, but it will take some time. . . .

The Weldon Court town home project was not mentioned in the PPM and there is no evidence that it was mentioned to the Plaintiffs before they made their investments.

On August 1, 2007, the Plaintiffs had an attorney send a letter to the Defendant and several other parties demanding a return of their investments (Plaintiffs' exhibit 42). On August 20, the Defendant sent a letter to the attorney stating that the Defendant had done nothing wrong. On the same date, the Defendant sent a letter to all of the investors asking for them to contribute funds for a lawsuit he was planning against people in Maryland (both letters are part of Defendant's exhibit 12).

Sunninghorse never returned the invested funds to the Plaintiffs.

The Defendant stated that he had invested substantial personal funds in various real estate projects and that he had lost those funds.

The Defendant filed for relief under Chapter 7 of the Bankruptcy Code on July 23, 2009. He received a discharge on February 9, 2010. In this adversary proceeding, filed November 10, 2009, the Plaintiffs seek to have Defendant held personally responsible for Sunninghorse's failure to return their investments and to have that obligation declared not discharged by his Bankruptcy discharge.

DISCUSSION

The first hurdle faced by the Plaintiffs is that they paid their money to a corporation, not to the Defendant.  Neither party raised that issue and the case was tried as if the Defendant is the responsible party.  Considering the facts that (1) the Defendant controlled PGI and it in turn controlled A2REI and it in turn controlled Sunninghorse and (2) the Defendant initiated all transactions with respect to the solicitation of funds and the acquisition of properties, it is appropriate to find that he is personally responsible for the representations which he made with respect to the investments and the handling of the funds.  In addition, Texas law holds that a corporation's agent is personally liable for his own fraudulent or tortious acts, even when acting within the course and scope of his employment.  *Sanchez v. Mulvaney*, 274 S.W. 3d 708, 712 (Tex. App. 2008).

The Plaintiffs seek to have the collective debts owed to them declared nondischargeable according to § 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.  Section 523(a) objections to dischargeability must be proven by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  The preponderance of the evidence standard requires the finder of fact to believe it is more probable than not that a fact exists in order to find for the party putting forth that fact.  *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997).

**Section 523(a)(2)(A)** denies the discharge of any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

For the debts to be nondischargeable under section 523(a)(2)(A), the Plaintiffs must prove that (1) the Defendant made a representation; (2) the Defendant knew the representation was false; (3) the representation was made with the intent to deceive the Plaintiffs; (4) the Plaintiffs actually and justifiably relied on the representation; and (5) the Plaintiffs sustained a loss as a proximate result of their reliance.  *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)).

At trial, the Defendant was asked whether Sunninghorse Acquisitions, LLC ever owned an agreement to acquire 100% of the outstanding member interests of Sunninghorse, LLC.  He answered: "No it did not."   All five prongs of the test put forth in *Acosta* are met by that statement: (1) the Defendant made the representation in the PPM that Sunninghorse had an agreement to acquire 100% of the outstanding member interest of Sunninghorse, LLC; (2) as evidenced by his testimony at trial, he knew the representation was false; (3) the representation was made with the intent to induce the Plaintiffs to invest in the project, and thus to deceive them; (4) the Plaintiffs actually and justifiable relied on the representation; and (5) the Plaintiffs lost money as a result of their reliance.

In addition, the Defendant represented to the Plaintiffs before they made their investments that the sale of units was "going well" and urged them to make their investments

7

before the deadline to be sure to get in on the deal.  In fact, only $500,000 was raised out of a goal of $5 million.  Certainly things cannot be said to be "going well" when only 10% of the expected amount is raised.  The court finds that those representations were knowingly false, made with the intent that they be relied upon, and that the Plaintiffs relied upon them to their detriment.

The Subscription Agreement was a form provided by the Defendant in the PPM.  It clearly required a return of the funds to the investors if the Sunninghorse LLC was not acquired.  Yet, when the funds were received, they were quickly diverted to other projects and expenses.  Such actions show that the Defendant understood the representation to be false because he placed Sunninghorse in a position where it could not make the refunds.  Certainly that representation was made with the intent to induce the Plaintiffs to invest in Sunninghorse and they relied upon it to their detriment.

**Section 523(a)(4)** denies the discharge of any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

***Fiduciary Capacity.***  The term "fiduciary capacity" qualifies "defalcation," but not "embezzlement." 4 COLLIER ON BANKRUPTCY ¶ 523.10 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)  Therefore, to prove defalcation on the part of the Defendant, the Plaintiffs must prove that the Defendant acted in a fiduciary capacity.

"The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists."  *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).  The trust obligation is created by a trust relationship that must predate and exist apart from the act from which the underlying indebtedness arose.  *Id.*  In this case, there was no pre-existing trust relationship and thus the debt is dischargeable under this provision.

**Embezzlement:**

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. . . .

> The required elements of embezzlement are: (1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting funds in an account accessible only to the debtor; and (3) the disbursal or use of those funds without explanation of reason or purpose.  For purposes of section 522(a)(4), it is improper to automatically assume embezzlement has occurred merely because property is missing, since it could be missing simply because of noncompliance with contractual terms. 4 COLLIER ON BANKRUPTCY ¶ 523.10[2] 16th Edition, 2009.

In this case, the Defendant used the funds in question for expenses and other investments.  It is not clear whether those investments were for his sole benefit or an attempt by him to place the

money into another project for the benefit of the Plaintiffs, other investors, and himself.  The court cannot find by a preponderance of the evidence that he embezzled the funds in question.

**Larceny:**

> Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner.  As distinguished from embezzlement, the original taking of the property must be unlawful. 4 COLLIER ON BANKRUPTCY ¶ 523.10[2] 16th Edition, 2009.

In this case, the original acquisition of the funds in question was lawful; consequently the Defendant did not commit larceny.

**Attorney's Fees**.  Plaintiffs requested attorney's fees as part of actual damages. They have not directed the court to any statute or contract which provides that they may recover Attorney's fees.  The only cases which the court has been able to find which allowed the recovery of attorney fees in a § 523(a) complaint involve (1) the award of attorney's fees in a prior state court proceeding, (2) the award of attorney's fees is provided by statute, or (3) a contract which provides for attorney's fees.  In *Cohen v. De La Cruz*, 523 U.S. 213 (1998), the Court allowed exemplary damages and attorney's fees in a § 523(a)(2)(A) compliant where they were provided for in a New Jersey statute.  In *Gober v. Terra + Corporation (In re Gober),* 100 F.3d 1195 (5th Cir. 1996) the court allowed attorney's fees and interest in a § 523(a)(4) and (6) case where they had been awarded in a state court judgment. Texas law does not allow the recovery of attorney's fees in tort actions.  *MBM Financial Corp. v. Woodlands Operating Co., L.P.,* 292 S.W. 3rd 660, 666-67 (Tex. 2000).  Since fraud sounds in tort, no attorney's fees would be allowed under state law.

The notes issued by Sunninghorse as part of the investment transaction provided for interest and attorney's fees in the event of default.  However, this adversary proceeding is not an action to collect upon the notes, but rather an action for fraud against the Defendant.  Thus, the provisions of the notes are not applicable.

At the beginning of the trial, Plaintiffs proposed to offer as witnesses a number of attorneys as part of the Plaintiffs' claim for attorney's fees.  In order to shorten the trial, the court told the attorney for the Plaintiff that, if the court determined to allow attorney's fees, the requested fees could be submitted in the usual form for a fee application in a Bankruptcy case. During the trial, the Defendant made a brief reference to a suit he filed in Maryland against third parties alleging that they had breached contracts with him.  There was no evidence that the Plaintiffs were parties to that suit.  There was no evidence of any suit filed by the Plaintiffs in Texas.  As a result, the only possible claim for attorney's fees by the Plaintiff would be the fees for this adversary proceeding.  Having established no basis for those fees, the Plaintiff's request should be denied.

## CONCLUSION

For the foregoing reasons, the court finds that pursuant to § 523(a)(2)(A) the following debts should be excepted from the bankruptcy discharge heretofore granted to the Defendant, Terry Wayne Hamann:

- In favor of Neo Ventures, LLC, the sum of $50,000
- In favor of Swartz & Brough, Inc., the sum of $100,000
- In favor of Mark Borough, the sum of $25,000

Each judgment shall bear interest from the date of entry until paid at the Federal Judgment rate pursuant to 28 U.S.C. § 1961.

The Plaintiffs shall also have judgment against the Defendant for all costs of court pursuant to Rule 7054(b) of the Federal Rules of Bankruptcy Procedure.

All other relief requested by the Plaintiffs is denied.

The court will issue a separate Judgment as required by Federal Rule of Civil Procedure 54(a) which is made applicable to Adversary Proceedings by Rule 7054(a) of the Federal Rules of Bankruptcy Procedure.

# # #